ENSLEY BRANCH OF the N. A. A. C. P. et al., Plaintiffs-Appellees,

v.

George SEIBELS et al., Defendants,

Personnel Board of Jefferson County, Defendant-Appellant.

John W. MARTIN et al., Plaintiffs-Appellees, Cross Appellants,

v.

CITY OF BIRMINGHAM et al., Defendants,

Personnel Board of Jefferson County, Defendant-Appellant Cross Appellee.

UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,

v.

JEFFERSON COUNTY et al., Defendants,

Personnel Board of Jefferson County, Defendant-Appellant, Cross-Appellee.

Lucy WALKER et al., Plaintiffs-Appellees,

v.

JEFFERSON COUNTY HOME et al., Defendants,

Personnel Board of Jefferson County, Defendant-Appellant.

No. 77–1819.

United States Court of Appeals, Fifth Circuit.

May 8, 1980.

Rehearing Denied June 16, 1980.

Hubert A. Grissom, Jr., David P. White-side, Jr., Birmingham, Ala., for defendant-appellant.

Howard P. Willens, Jay F. Lapin, David R. Johnson, Washington, D. C., for Educational Testing Service.

Susan Williams Reeves, Birmingham, Ala., Michael A. Middleton, Jackson, Miss., Caryl P. Privett, Asst. U. S. Atty., Birmingham, Ala., for plaintiffs-appellees.

Deborah M. Seymour, Joshua D. Rosenberg, Dept. of Justice, Ed. Section, Civil Rts. Div., Washington, D. C., for Lucy Walker.

Robert T. Moore, Employment Section Civil Rts. Div., Dept. of Justice, Washington, D. C., J. R. Brooks, Jr., U. S. Atty., Birmingham, Ala., Richard M. Sharp, William R. Galeota, Washington, D. C., for John W. Martin et al.

Before GODBOLD, RONEY and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

This case is a consolidation of four separate actions brought by the United States and private parties against the Personnel Board of Jefferson County, Alabama, and other local government agencies. The district court held that the Personnel Board's use of two examinations in screening and certifying candidates for jobs as police officers and firefighters violates Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. The court ordered certain remedies, the remedies being tailored to its conclusion that use of the police officer test did not violate Title VII until April 25, 1975, and that use of the firefighter test did not violate Title VII until July 8, 1976. We agree with the district court that the Personnel Board's use of both tests abridges Title VII; however, we believe that the court failed to make essential findings in determining the time at which liability commenced. Accordingly, we affirm in part and reverse and remand in part with instructions.

On January 4, 1974, the Ensley Branch of the National Association for the Advancement of Colored People, together with certain named individuals, for themselves and on behalf of others similarly situated, filed a complaint in the United States District Court for the Northern District of Alabama, against George Seibels (then Mayor of Birmingham, Alabama), the City of Birmingham, the members of the Personnel Board of Jefferson County, and the Personnel Director of that Board, alleging that the defendants engage in discriminatory hiring practices against blacks in violation of the Fourteenth Amendment, 42 U.S.C. §§ 1981, 1983, and 2000e et seq. (Title VII). A suit raising the same constitutional and statutory allegations was filed on January 7, 1974, by John W. Martin and other named plaintiffs against the City of Birmingham, Jefferson County, and the Personnel Board of Jefferson County.[1] On May 27, 1975, the United States brought suit against the Jefferson County Personnel Board and the municipal and other governmental jurisdictions

---

1. Also named as defendants in the *Martin* suit are the Director of the Jefferson County Personnel Board and three Jefferson County Commissioners.

within Jefferson County[2] alleging a pattern or practice of discriminatory employment practices against blacks and women in violation of Title VII, the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 42 U.S.C. § 3766(c), the State and Local Fiscal Assistance Act of 1972, as amended, 31 U.S.C. § 1242, the Fourteenth Amendment and 42 U.S.C. § 1981. On February 20, 1976, Lucy Walker filed suit challenging the employment practices of the Jefferson County nursing home under Title VII and 42 U.S.C. § 1981. All four cases were consolidated for trial.

On December 20–22, 1976, trial was held on the merits of the limited issue of whether the two tests used by the Personnel Board to screen and rank applicants for positions as police officers and firefighters are discriminatory and violative of the constitutional or statutory rights of blacks.[3] All other issues under the complaints were reserved until a later date.

On January 10, 1977, pursuant to Fed.R. Civ.P. 54(b), the district court entered a final order on this limited issue.[4] The court held that the police and firefighter tests do not violate the Constitution,[5] but do violate Title VII. The court determined that the Title VII violation commenced on April 25,

1975, with respect to the police test and on July 8, 1976, with respect to the firefighter test. The Court ordered certain remedies to correct the discrimination caused by use of the tests since those dates.[6] From this judgment, the Personnel Board filed a notice of appeal, and the United States and the plaintiffs in the *Martin* action filed a joint notice of cross-appeal. The Personnel Board contends that the tests do not violate Title VII; the United States and the *Martin* plaintiffs contest the court's determination as to when Title VII liability commenced.

This case has been ably argued on appeal by counsel for both sides,[7] and we also have the benefit of a well-reasoned and comprehensive opinion by Judge Pointer of the court below.

## FACTS

The Personnel Board of Jefferson County is required under Alabama law to administer examinations to applicants for positions with local government agencies. Two such examinations are at issue here: the 10–C test administered to applicants for positions with the police department, and the 20–B test administered to applicants for positions with the fire department. Both tests were

---

2. Defendants in the government's suit other than the Personnel Board are Jefferson County, the County Department of Public Health, and the cities of Bessemer, Birmingham, Fairfield, Fultondale, Gardendale, Homewood, Huey Town, Midfield, Mountainbrook, Pleasant Grove, Tarrant, and Vestavia Hills.

3. At trial, plaintiffs dropped their attack on the Office Worker test administered by the Personnel Board and also dropped their claim that the police and fire tests discriminate on the basis of sex.

4. The district court's opinion and order is reported at 13 Empl.Prac.Dec. (E.P.D.) ¶ 11, 504

5. The district court found that the Personnel Board's use of the tests in issue is not motivated by intentional discrimination. The parties do not dispute this finding. This appeal, therefore, is restricted to Title VII issues.

6. Specifically, the Court ordered that blacks be referred for openings on the police and firefighter forces at the rate at which they took the tests when most recently administered. To accomplish this, the Court ordered that the names of a sufficient number of blacks be add-

ed to the current police and firefighter eligibility lists so that the lists shall be representative of the racial composition of the test-takers, i. e., 28 and 14 percent black for police and firefighter lists, respectively; that, one-third of future certifications, i. e., referrals from the lists for actual employment, are to be black until, considering all certifications since the relevant 1975 and 1976 dates, the numbers of certifications become representative of the racial composition of the test-takers. Thereafter, blacks are to be certified in accordance with their representation on the lists, i. e., 28 and 14 percent of certifications for policemen and firefighters, respectively, will be black. Similarly, referrals from future lists will be a function of the rate at which blacks take the examinations on which the lists are based, until or unless defendants develop valid tests. 13 E.P.D. at 6807–08.

7. The Educational Testing Service, Inc. filed a brief as *amicus curiae* urging reversal of the district court's holding that the tests violate Title VII.

developed by the International Personnel Management Association.[8] Each test is a paper and pencil instrument consisting of 120 multiple choice questions.[9]

Applicants who pass [10] the 10-C or 20-B are placed on an eligibility list for positions with the police or fire department, and are ranked on the list in the order of their scores. If a single vacancy occurs, the three persons at the top of the list are certified to the appropriate department for final selection. If multiple vacancies occur, the number of persons certified is two more than the number of vacancies to be filled. Thus, merely passing the tests, and thereby being entered on the relevant eligibility list, is not nearly so important as obtaining a score sufficiently high to be placed high enough on the list to be actually certified to the police or fire department.

## ADVERSE IMPACT

■ A *prima facie* Title VII case against an employment test may be built with statistics showing that use of the test has an adverse racial impact. This showing shifts to the employer the burden of proving that the test is job-related. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971); *Scott v. City of Anniston*, 597 F.2d 897, 901 (5th Cir. 1979).

The district court found that use of the 10-C and 20-B has an adverse impact upon blacks. The evidence shows that since March 24, 1972, the date Title VII became applicable to public employers such as the Personnel Board, only 51 blacks (6.6%) have been hired out of a total of 768 blacks who took the police test. The comparable figure for whites is 455 whites hired (23.3%) out of the total of 1,953 whites who took the police test. Similarly, only 9 black firefighters have been hired, which represents 3.2% of the black applicants, as compared to 215 white firefighters hired, which represents 14.1% of the white applicants. With respect to the number of blacks and whites who passed the exam, the court found that the pass rates for blacks (48.6% for the police test and 24.2% for the firefighter test) are substantially less than the pass rates for whites (90.2% for the police test and 82.5% for the firefighter test). The Personnel Board does not in this appeal contest the district court's finding that the two tests have an adverse impact; the Board argues only that it has carried its burden of showing that the tests are job-related.

## JOB–RELATEDNESS

■ To prove the job-relatedness of the police and firefighter tests, the Personnel Board employed criterion-related validity studies.[11] The district court held that the studies failed to validate either test.[12]

8. The International Personnel Management Association was formerly the Public Personnel Association.

9. Since April 10, 1974, only 80 of the 120 questions have been used in grading the 10-C test. We have examined the tests and note in passing that a very substantial number of the questions seem to be aimed primarily at verbal or mathematical ability.

10. The raw score which constitutes a passing grade fluctuates, depending on the number of vacancies anticipated and other factors.

11. "Validation" is the process of determining whether a selection device is sufficiently job-related to comply with the requirements of Title VII. *See* Uniform Guidelines on Employee Selection Procedure [hereinafter referred to as Uniform Guidelines], 43 Fed.Reg. 38290, 38291 (August 25, 1978). There are three basic methods of validation: " 'criterion' validity (demonstrated by identifying criteria that indicate successful job performance and then correlating test scores and the criteria so identified); 'construct' validity (demonstrated by examinations structured to measure the degree to which job applicants have identifiable characteristics that have been determined to be important in successful job performance); and 'content' validity (demonstrated by tests whose content closely approximate tasks to be performed on the job by the applicant)." *Washington v. Davis*, 426 U.S. 229, 247, 96 S.Ct. 2040, 2051, 48 L.Ed.2d 597 n.13 (1976); *see* Uniform Guidelines, § 5, 43 Fed.Reg. at 38298.

The Uniform Guidelines cited in this footnote were adopted on August 25, 1978, by the Equal Employment Opportunity Commission (EEOC), the Civil Service Commission (CSC), the Department of Labor (DOL), and the Department of Justice (DOJ), and are codified in the 1979

12. See note 12 on p. 817.

The studies used three criterion measures: academy grades, *i. e.,* relative class rank among students who successfully complete academy training; efficiency ratings of incumbent employees (police and firefighters) by their supervisors; and experimental ratings of incumbent employees by their supervisors, based on 12 categories, the categories relating to personality characteristics, job knowledge and job-related abilities.

editions of 29 C.F.R. § 1607 (EEOC); 5 C.F.R. § 300.103(c) (CSC); 41 C.F.R. § 60–3 (DOL); and 28 C.F.R. § 50.14 (DOJ). The Guidelines, effective September 25, 1978, supersede the guidelines on employee selection procedure previously issued by the EEOC and the DOJ (the DOJ Guidelines were issued jointly with the DOL and CSC). With the exception of its provision on interim use of unvalidated tests, discussed below, the Uniform Guidelines are consistent, in all matters pertinent to this case, with the EEOC and DOJ Guidelines. This opinion shall refer to the EEOC and DOJ Guidelines as well as to the Uniform Guidelines; citations to the former will be to the 1978 C.F.R., citations to the latter will be to the Federal Register.

12. The Personnel Board, in 1970, initiated a preliminary, in-house, validation study of the 10–C police officer test. This study, developed by Eugene Williams, Chief Examiner of the Board, was not designed to meet the validation requirements of Title VII and was not relied upon by the district court in assessing the validity of the 10–C.

The studies upon which the district court based its holding of no job-relatedness, and which are the subjects of our review, were conducted by Drs. William McLaurian and William Farrar, psychology professors at the University of Alabama in Birmingham. The McLaurian-Farrar studies examined both the 10–C police officer test and the 20–B firefighter test. The final results of these studies, (the studies began in 1972) were reported to the Personnel Board on August 25, 1975, with respect to the 10–C and on July 8, 1976, with respect to the 20–B.

13. Explanation of a few statistical concepts is in order. We quote at length from the government's brief:

Statistically, the degree of correlation between two variables (*e. g.,* entrance exam scores and subsequent school grades) is expressed as a 'correlation coefficient' on a scale running from +1.0 to −1.0. A perfect positive correlation (*e. g.,* entrance exam scores exactly predict subsequent school grades, with the higher exam scores predict-

*Academy Grades.* The district court found that the scores on the 10–C and 20–B tests bear statistically significant [13] correlation to grades in the training academies and it further found that the training academies furnished skills or knowledge needed for performance on the job. However, the district court also found that academy grades are not valid predictors of job performance.[14] The court concluded from these findings that while completion of the academy is a valid criterion measure, academy

ing the best grades) would be expressed as +1.0, and a perfect negative correlation (*e. g.,* entrance exam scores exactly predict subsequent school grades, except in reverse, with the lower exam scores predicting the best grades) would be expressed as −1.0. Where the two variables had absolutely no relationship to each other, the correlation coefficient would be .0. The closer a correlation coefficient is to either +1.0 or −1.0, the 'higher the magnitude' of the correlation; and the closer it is to .0, the 'lower the magnitude.' Mueller, Schuessler & Castner, *Statistical Reasoning in Sociology,* 2d Ed., at p. 315.

Because a purely random drawing of a sample is liable to produce a correlation coefficient which is somewhat off an absolute .0, the concept of statistical significance becomes relevant. The concept is tied to the statistical theory of probability and is dependent upon the number of people in the sample. Generally, if a correlation coefficient is so low that, on the basis of the sample size involved, more than 1 in 20 random drawings could be expected to produce a correlation at least as great, that correlation coefficient is considered not to be statistically significant, or simply to be the same as a correlation coefficient of .0. On the other hand, if the obtained coefficient could be expected to reoccur no more than once in 20 random drawings, it is considered statistically significant, the statistical indication for which is $p < .05$. A correlation coefficient of the obtained magnitude which could not be expected to occur by chance more than once in 100 random drawings is expressed as $p < .01$. Mueller, et al., pp. 394, *et seq.*

14. The court pointed out that "for the most part the correlation between academy grades and measures of job performance are not significant and, in the few instances where significant correlations are found, the findings are mixed, some being positive and others being negative. A negative correlation, of course, indicates that the higher the academy grades, the lower the performance ratings tend to be." 13 E.P.D. at 6802.

grades are not. Finally, the court found that even though completion of the training academies is a valid criterion measure, neither test predicts successful completion of the academies; even extremely low test scores do not predict failure at the academies.

*Efficiency Ratings.* Drs. Farrar and McLaurian, the experts who conducted the validation studies, testified that the efficiency ratings are not trustworthy assessments of the employees' actual performance. Largely based on this testimony, the court held that the efficiency ratings are not a valid criterion measure.

*Experimental Ratings.* Although determining that the experimental ratings system is an appropriate criterion measure for determining job-relatedness, the court discovered fatal deficiencies in the relationship between the test scores and the ratings. With respect to the 20–B test, the court found that while there is a statistically significant positive correlation between test scores and the experimental ratings for firefighters having less than three years' experience, there is a significant negative correlation for firefighters having more than three years' experience, thus "suggesting that over time the lower scoring applicants may be better employees." Accordingly, the court held that the 20–B is not a valid predictor of the experimental ratings.

With respect to the 10–C test, the court found that there is a statistically significant correlation between test scores and experimental ratings, but that the correlation is of very low magnitude and lacks practical significance.[15] Accordingly, the court held that the correlation between the 10–C and the experimental ratings does not validate the 10–C for operational use in screening or ranking applicants.

■ The Personnel Board raises numerous objections to the above findings by the district court respecting the validity studies. We have reviewed these findings under the clearly erroneous standard. *See Wade v. Mississippi Cooperative Extension Service,* 528 F.2d 508, 516 (5th Cir. 1976); *United States v. City of Chicago,* 549 F.2d 415, 429 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission,* 482 F.2d 1333, 1337 (2d Cir. 1973), *cert. denied,* 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975); *Washington v. Davis,* 426 U.S. 229, 256, 96 S.Ct. 2040, 2055, 48 L.Ed.2d 597 (1976) (Stevens, J., concurring). Because we are not left with a "definite and firm conviction" that the court committed a mistake in holding that the studies do not demonstrate job-relatedness, *Wade v. Mississippi Cooperative Extension Service, supra,* 528 F.2d at 516, we reject the Board's objections.[16]

---

15. Practical or operational significance is required by the guidelines. Uniform Guidelines, § 14B(6), 43 Fed.Reg. at 38301; EEOC Guidelines, 29 C.F.R. § 1607.5(c)(2); DOJ Guidelines 28 C.F.R. Part 50.14 § 12B(5). Judge Pointer's finding that the 10–C lacks practical significance was reached through painstaking application of several different statistical approaches, *see* 13 E.P.D. at 6803–06; additionally, as permitted by the guidelines, the judge's inquiry into practical significance considered, *inter alia,* the degree of adverse impact of the 10–C. Id. at 6806.

16. The Board's principal criticism of the findings below is the alleged failure of Judge Pointer to apply a "corrected coefficient," which would make the statistics relating to the police test more favorable to the Board. The Board has not convinced us that the district court failed to give proper consideration to the "corrected coefficient." A careful reading of Judge Pointer's opinion makes it apparent that the judge recognized that the "corrected coefficient" is based on several assumptions, and the judge, accordingly and properly, used the "corrected coefficient" with due regard for its dependence on these assumptions. The crucial finding of the district court, which was reached after careful and comprehensive consideration of all the facts and circumstances, is that the validation study showed that the police test is predictive of better job performance, but that the magnitude of the positive prediction is so low that the test is worthless for all practical purposes. We cannot conclude that this finding is clearly erroneous.

The Board's only other significant attack on the district court's findings is its suggestion that several of the statistical approaches used by Judge Pointer in analyzing the operational utility of the police test were inappropriate. The Board has not convinced us in this regard.

## APPLICATION OF WASHINGTON V. DAVIS

■ The Personnel Board's principal argument on appeal is based on the Supreme Court's opinion in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The Board focuses on the district court's finding that both the police test and the firefighter test bear a statistically significant correlation to training academy grades. With that focus the Board argues that the *Davis* case compels a decision in its favor. The Board contends that the *Davis* case stands for the general proposition that a test can be validated by showing that it predicts grades in a job-relevant training program, without regard to the test's ability to predict job performance.[17] As discussed below, the *Davis* case held that the test there was properly validated because it was shown to predict whether those tested had the *minimum* reading and verbal skills necessary to *complete* a job-relevant training program. We do not believe the *Davis*[18] rationale can be extended, as the Board urges, to the general proposition that any test can be validated by showing a relationship to training. More specifically, we reject the Board's suggested extension of the *Davis* holding to this case, where the

However, even if we should eliminate from our consideration all of the statistical approaches used by the district judge except the two approved by the Board, namely, the Taylor-Russell approach and the Anastasi approach, we still could not label as clearly erroneous the district court's finding that the police test is not appropriate for operational use.

17. The Board contends that this interpretation of *Washington v. Davis* was adopted by the Supreme Court in its summary affirmance of the three-judge District Court decision in *United States v. South Carolina*, 445 F.Supp. 1094 (D.S.C.) aff'd. 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (1978). The Board's reliance on *United States v. South Carolina* is misplaced for three reasons. (1) "[T]he precedential effect of a summary affirmance can extend no farther than 'the precise issues presented [in the jurisdictional statement required by Supreme Court Rule 15] and necessarily decided by those actions.'" *Illinois State Board of Elections v. Socialist Workers' Party*, 440 U.S. 173, 182, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979); *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 477 n.20, 99 S.Ct. 740, 750 n.20, 58 L.Ed.2d 740 (1979); *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977). We have examined the jurisdictional statement filed with the Supreme Court in *United States v. South Carolina* and determined that neither of the two issues presented specifically addresses the *Washington v. Davis* question of validation against training. (2) A summary affirmance affirms only the judgment and not the reasoning of the court below. *Illinois State Board of Elections v. Socialist Workers' Party, supra,* 440 U.S. at 182–83, 99 S.Ct. at 989–990; *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation, supra,* 439 U.S. at 477 n.20, 99 S.Ct. at 750 n.20; *Mandel v. Bradley, supra,* 432 U.S. at 176, 97 S.Ct. at 2240. Therefore, the three-judge District Court's interpretation of *Washington v. Davis*, to the extent that interpretation differs from our own, is not binding on this Court. (3) *United States v. South Carolina* is factually distinguishable from the instant case. The State of South Carolina used minimum score requirements on the National Teachers Examination to certify and determine the pay levels of teachers within the State. A content validity study demonstrated that the content of the exam matched the content of teacher training programs in South Carolina, and that the minimum score requirement correlated to the minimum amount of knowledge necessary to effective teaching. 445 F.Supp. at 1112–14. *See also id.* at 1107. After a certain date, examinees who did not achieve the minimum score, and thus lacked the minimum amount of knowledge to teach effectively, were not certified. Before that date, most examinees who did not achieve the minimum score were certified, but their compensation was less than those who scored the minimum. *Id.* at 1105–06 & n.12. Thus, the test in *South Carolina* was used solely as a measure of minimal competence to teach, much as the test in *Washington v. Davis* was used to determine a minimum level of required competence. In contrast, the instant tests were used not to determine minimum competence to perform as policemen or firefighters, but for ranking purposes unrelated to minimum competence.

18. Some authorities suggest that *Washington v. Davis* has no application to Title VII because the action in *Davis* was brought under the due process clause of the Fifth Amendment, 42 U.S.C. § 1981, and D.C.Code § 1–320, and not Title VII. *See, e. g. Guardians Association of the New York City Police Department, Inc. v. Civil Service Commission of the City of New York*, 431 F.Supp. 526 (S.D.N.Y.), *vacated and remanded on other grounds,* 562 F.2d 38 (2nd Cir. 1977). *See also Davis,* 426 U.S. at 255, 96 S.Ct. at 2054 (Stevens, J., concurring). Since we conclude that *Washington v. Davis* is factually distinguishable, we do not reach the question of its application to Title VII.

tests were not used to ascertain the minimum skills necessary to complete job-relevant training[19], but rather were used to rank job applicants according to their test scores and to select only the highest test scorers for job placement.

In *Washington v. Davis*, two blacks (respondents in the Supreme Court but referred to here as plaintiffs), whose applications to become police officers in the District of Columbia Police Department had been rejected, claimed, *inter alia*, that a written test ("Test 21") used by the Department for recruiting purposes violated their rights under the due process clause of the Fifth Amendment, 42 U.S.C. § 1981, and D.C.Code § 1–320. Test 21, developed by the Civil Service Commission and administered throughout the federal service, was designed to test the verbal ability, vocabulary, reading and comprehension of potential recruits for the police department. In order to gain entry into the training program, a grade of at least 40 out of 80 was required on Test 21. Plaintiffs moved for summary judgment seeking a declaration that Test 21 unlawfully discriminated in violation of the Fifth Amendment. The defendants filed a counter-motion for summary judgment, asserting that plaintiffs were entitled to relief on neither constitutional nor statutory grounds.

The district court granted defendants' and denied plaintiffs' motions. *Davis v. Washington*, 348 F.Supp. 15 (D.D.C.1972). The district court found, among other things, that a higher percentage of blacks failed Test 21 than whites, and that the test had not been validated to establish its reliability for measuring subsequent job performance. These findings were held sufficient to shift the burden of proof to defendants. *Id.* at 16. The district court found that defendants had met their burden by proving that "the Test is directly related to

a determination of whether the applicant possesses *sufficient* skills requisite to the demands of the curriculum a recruit must master at the police academy." *Id.* at 17 (emphasis added).[20] Given its relationship to the training program, the court held that the lack of job performance validation did not defeat the test.

The Court of Appeals reversed on constitutional grounds. 512 F.2d 956 (D.C.Cir. 1975). Applying the Title VII principles developed in *Griggs v. Duke Power Co.*, *supra*, 401 U.S. at 424, 91 S.Ct. at 849, to the Fifth Amendment claim, it held, *inter alia*, that without proof by defendants that Test 21 had been validated in regard to job performance, defendants had not rebutted plaintiffs' prima facie case of discriminatory impact. *Id.* at 961–65.

The Court of Appeals was in turn reversed by the Supreme Court. After holding that the D. C. Circuit had erred in applying Title VII standards to the Fifth Amendment claim of discrimination, the Supreme Court considered the statutory issues raised by the summary judgment motion. The Court approved the use of Test 21 to determine the minimum skills necessary for satisfactory progress in the training program. For the majority, Justice White wrote:

> The advisability of the police recruit training course informing the recruit about his upcoming job, acquainting him with its demands, and attempting to impart a modicum of required skills seems conceded. It is also apparent to us, as it was to the District Judge, that *some minimum verbal and communicative skill would be very useful, if not essential, to satisfactory progress in the training regimen.* Based on the evidence before him, the District Judge concluded that Test 21

**19.** In this case, Judge Pointer found that neither test predicts successful completion of the training programs. See n.23, *infra*.

**20.** Defendants' argument to the district court was that, "Undeniably, a police recruit must have the minimum reading skills in order to complete the curriculum at the Training Academy . . . Test 21 merely makes certain that a potential recruit has the minimum skills in reading and verbal ability." Memorandum in Support of Defendants Hampton, Spain and Andolsek's Motion for Summary Judgment, U.S. Supreme Court Records, Briefs at 97, FO–0097–75 (1975).

was directly related to the requirements of the police training program and that a positive relationship between the test and training-course performance was sufficient to validate the former, wholly aside from its possible relationship to actual performance as a police officer. This conclusion of the District Judge that training-program validation may itself be sufficient is supported by regulations of the Civil Service Commission, by the opinion evidence placed before the District Judge, and by the current views of the Civil Service Commissioners who [are] parties to [this] case. Nor is the conclusion foreclosed by either *Griggs* or *Albemarle Paper Company v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); and it seems to us the much more sensible construction of the job-relatedness requirement.

426 U.S. at 250–251, 96 S.Ct. at 2052–2053 (emphasis added). Earlier in the opinion Justice White discussed the various ways a test could be validated:

It is necessary, in addition, that they be 'validated' in terms of job performance in any one of several ways, perhaps by ascertaining the *minimum* skill, ability, or potential *necessary* for the position at issue.

426 U.S. at 247, 96 S.Ct. at 2051 (emphasis added). Similarly, Justice Stevens, concurring, stated:

The test serves the neutral and legitimate purpose of requiring all applicants to meet a uniform *minimum* standard of literacy. Reading ability is manifestly relevant to the police function, there is no evidence that the required passing grade was set at an arbitrarily high level.

426 U.S. at 254, 96 S.Ct. at 2054 (emphasis added). And, later in his concurring opinion:

As a matter of law, it is permissible for the police department to use a test for the purpose of predicting ability to master a training program even if the test does not otherwise predict ability to perform on the job. I regard this as a

reasonable proposition and not inconsistent with the Court's prior holdings. 426 U.S. at 256, 96 S.Ct. at 2055. Further explaining his own opinion for the *Davis* majority, Justice White, in his dissent from the summary affirmance of *United States v. South Carolina*, 434 U.S. 1026, 98 S.Ct. 756, 54 L.Ed.2d 775 (1977), stated:

*Washington v. Davis* . . . was thought by the District Court to have warranted validating the test in terms of the applicant's training rather than against job requirements; but *Washington v. Davis*, in this respect, held only that the test there involved, which sought to ascertain whether the applicant had the *minimum* communication skills necessary to understand the offerings in a police training course, could be used to measure eligibility to enter that program. The case did not hold that a training course, the completion of which is required for employment, need not itself be validated in terms of job relatedness. Nor did it hold that a test that a job applicant must pass and that is designed to indicate his mastery of the materials or skills taught in the training course, can be validated without reference to the job. Tests supposedly measuring an applicant's qualifications for employment, if they have differential racial impact, must bear 'some manifest relationship to the employment in question,' *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 [, 91 S.Ct. 849, 854, 28 L.Ed.2d 158] (1971) . . .

434 U.S. at 1027–28, 98 S.Ct. at 757 (emphasis added).

 Thus, *Washington v. Davis* holds that a selection device may be validated if it is shown to predict whether an applicant has the minimum amount of reading and verbal skills necessary to complete a job-relevant training program. We decline the Personnel Board's invitation to extend the *Davis* rationale by holding that any test can be validated against training, without respect to the test's ability to predict job performance.[21] Such an extension would

---

21. Other courts similarly refuse to read *Washington v. Davis* as establishing that selection

devices may be validated for Title VII purposes without regard to job performance. *See, e. g.,*

violate the requirement of job performance validation enunciated in *Griggs* and *Albemarle*, as well as the agency guidelines [22] elaborating upon that requirement.

■ Unlike the test upheld in *Washington v. Davis*, the tests used by the Personnel Board are not used to predict whether an applicant has the minimum amount of knowledge necessary to complete training [23]; rather, the tests are used to rank applicants according to their scores. Only those at the top of the eligibility list, those with the highest test scores, are certified for job placement. Even those who score a passing grade, and are deemed by the Personnel Board to possess the capacity to complete training, are not hired unless they are among the highest scorers. Use of a test for such ranking purposes,[24] rather than as a *Davis*-like device to screen out candidates without minimum skills, is justified only if there is evidence showing that those with a higher test score do better on the job than those with a lower test score. Such evidence is utterly lacking here. The Board's validation studies show that higher test scores do *not* predict better job performance.[25]

Having accepted the district court's finding that the Personnel Board did not carry its burden of showing that the two tests are job-related, and having rejected the Board's suggestion that the *Davis* case can be extended to justify validation of these tests against training grades without regard to job performance, we affirm the district court's holding that the Personnel Board's use of the two tests violates Title VII. We turn next to the remedy issue and the subsidiary question of when the Board's Title VII liability commenced.

## COMMENCEMENT OF LIABILITY

The Personnel Board became subject to the requirements of Title VII on March 24,

*Blake v. City of Los Angeles*, 595 F.2d 1367, 1382 n.17 (9th Cir. 1979), *petition for cert. filed*, 48 U.S.L.W. 3125 (U.S. July 12, 1979) (No. 79-54); *Guardians Association of the New York City Police Department, Inc. v. Civil Service Commission of the City of New York*, 431 F.Supp. 526, 548–49 (S.D.N.Y.), *vacated and remanded on other grounds*, 562 F.2d 38 (2d Cir. 1977). *But see, United States v. Virginia*, 454 F.Supp. 1077, 1100–01 (E.D.Va.1978).

**22.** The agency guidelines require that a criteria-related validity study, such as the one at bar, show a positive relationship between the challenged test and job performance. Uniform Guidelines, § 5B, 43 Fed.Reg. at 38298. These guidelines, while not binding on the courts, are entitled to great deference. *Albemarle Paper Company v. Moody*, 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975); *Thomas v. E.I. duPont de Nemours & Company*, 574 F.2d 1324, 1331 n.9 (5th Cir. 1978); *Pettway v. American Cast Iron Pipe Company*, 494 F.2d 211, 221 (5th Cir. 1973), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); *United States v. Georgia Power Company*, 474 F.2d 906, 913 (5th Cir. 1973).

**23.** Indeed, the district court found the tests inappropriate even for the limited purpose of determining whether an applicant has the minimum capacity to complete training. The court found that neither test is a valid predictor of ability to pass the training curriculum. 13 E.P.D. at 6802–03. It should also be noted that the Personnel Board has not contended on this appeal for such limited, *Davis*-sanctioned, use of the tests.

**24.** The guidelines also distinguish tests used for screening from tests used for ranking. To validate the latter under a criterion-related study, "the user need show mathematical support for the proposition that persons who receive higher scores on the [selection] procedure are likely to perform better on the job." Questions and Answers to Clarify and Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures, 44 Fed.Reg. 11996, 12005 (Question & Answer 62).

**25.** As previously noted, the Board's validation studies do show that the tests predict acadamy grades. However, academy grades cannot be used as the criterion with which the tests are compared, because the district court found that acadamy grades do not themselves predict job performance. *See* Blake, supra, *595 F.2d at 1382;* Vulcan Society of the New York City Fire Department, Inc. v. Civil Service Commission, *490 F.2d 387, 396 n.11 (2d Cir. 1973).* " 'The entire rationale of a criterion-related study requires that the criterion with which the test results are compared be a good measure of job performance.' " James v. Stockham Valves and Fittings Co., *559 F.2d 310, 340 (5th Cir. 1977),* cert. denied, *434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978),* quoting United States v. City of Chicago, supra, *549 F.2d at 433.*

1972. Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, 86 Stat. 103. On that date, and for several years earlier[26], the Board was using the 10 C and 20 ·B to screen and rank applicants. However, the district court held that use of the police test did not begin to violate Title VII until April 25, 1975, and that use of the firefighter test did not constitute a violation until July 8, 1976. Those were the dates on which the final results of the validation studies for the two tests (the studies were started in late 1972) were reported to the Board. The court explained:

> The preliminary reports from the consultants, made while more trustworthy measures of job performance were being developed [*i. e.*, the experimental ratings], contained signs of potential validity and recommended continued usage of the test pending the additional studies. Not until April 25, 1975, with respect to the 10–C, and July 8, 1976, with respect to the 20–B were the studies using these new criterion measures completed and reported to the Board. It was on these respective dates that, in the court's opinion, it should have been concluded that provisional use of the tests was no longer permissible. Prior thereto, the Board was, in the court's opinion, justified in continuing to use the tests (and the eligibility lists generated therefrom) in anticipation of favorable results from those studies.

13 E.P.D. at 6807.

It appears from the court's reference to "provisional use" that Judge Point-

er was relying on § 1607.9 of the EEOC Guidelines in holding the Board free from liability pending its receipt of the final validation studies report.[27] Section ·1607.9 "authorize[s] provisional use of tests, pending new validation efforts, in certain very limited circumstances." *Albemarle Paper Co. v. Moody, supra*, 422 U.S. at 436, 95 S.Ct. at 2380. Section 1607.9 reads in full:

> § 1607.9 Continued use of tests.
>
> Under certain conditions, a person may be permitted to continue the use of a test which is not at the moment fully supported by the required evidence of validity. If, for example, determination of criterion-related validity in a specific setting is practicable and required but not yet obtained, the use of the test may continue: *Provided*: (a) The person can cite substantial evidence of validity as described in § 1607.7(a) and (b); and (b) he has in progress validation procedures which are designed to produce, within a reasonable time, the additional data required. It is expected also that the person may have to alter or suspend test cutoff scores so that score ranges broad enough to permit the identification of criterion-related validity will be obtained.

Section 1607.7 of the EEOC Guidelines provides that where it is not feasible to conduct a proper validation study,

> evidence from validity studies conducted in other organizations, such as that reported in test manuals and professional literature, may be considered acceptable when: (a) The studies pertain to jobs which are comparable (*i. e.*, have basically

---

**26.** The Board started using the police and fire tests on August 18, 1967, and October 23, 1968, respectively.

**27.** It appears also that in fixing the date of Title VII liability, the district court considered the good faith and lack of discriminatory intent of the Board in adopting and using the 10–C and 20–B. The court observed that the Board was compelled by state law to administer employment tests to screen and rank applicants; that the Board selected the 10–C and 20–B in the late 1960's "as the best tests then available, with the hope that black applicants would fare better than under previous tests"; that the Board conducted a preliminary, in-house, valid-

ity study of the tests even before it became subject to Title VII; and that, "at least since 1965 the Board has not intentionally discriminated against black applicants." 13 E.P.D. at 6806–6807. We do not question the court's finding that the Board acted in good faith and without discriminatory intent. However, to the extent that this finding influenced the court's determination as to when liability commenced, error was committed. Absence of discriminatory intent is no defense in a Title VII disparate impact case. *Griggs v. Duke Power Co., supra*, 401 U.S. at 432, 91 S.Ct. at 854; *Albemarle Paper Co. v. Moody, supra*, 422 U.S. at 422, 95 S.Ct. at 2373.

the same task elements), and (b) there are no major differences in contextual variables or sample composition which are likely to significantly affect validity. Any person citing evidence from other validity studies as evidence of test validity for his own jobs must substantiate in detail job comparability and must demonstrate the absence of contextual or sample differences cited in paragraphs (a) and (b) of this section.

To justify use of the 10–C and 20–B under § 1607.9, the Personnel Board should have shown (1) that validation studies done elsewhere, as described in § 1607.7, provided substantial evidence of validity[28] and, (2) that at all relevant times the Board had in progress validation procedures designed to produce, within a reasonable time, the additional data required. The district court did not determine whether either of these conditions was satisfied. Because we believe that this determination "is a matter best decided in the first instance by the District Court," *Albemarle Paper Co. v. Moody, su-*

*pra,* 422 U.S. at 436, 95 S.Ct. at 2380, we remand to the district court to ascertain whether the conditions were met.

If the district court, upon remand, finds that use of the tests was permissible under § 1607.9 until the Board received the final results of the validation studies, and if the court also finds that the Board in good faith relied upon § 1607.9, then the district court would be correct in starting Title VII liability on April 25, 1975 (police test), and July 8, 1976 (firefighter test). The natural reading of EEOC Guideline § 1607.9 (as it was in effect at all times relevant to this proceeding[29]), especially when read in light of Title VII, § 713(b), is that an employer will be immune from liability during the period of permissible provisional use of an unvalidated test. Section 713(b) of Title VII provides a defense to an employer who complies with, and relies in good faith upon, EEOC Guidelines, such as § 1607.9.[30] Section 713(b) provides:

> In any action or proceeding based on any alleged unlawful employment practice, no

**28.** The first condition for interim use under § 1607.9 is that "(a) The person can cite substantial evidence of validity *as described in § 1607.7(a) and (b)."* (Emphasis supplied). Thus, unless an employer cites to other validity studies which meet the requirements of § 1607.7, he has not satisfied § 1607.9(a). This condition lends objectivity to § 1607.9(a)'s substantial evidence requirement, and does not place an onerous burden on employers. *Compare Friend v. Leidinger,* 446 F.Supp. 361, 370 (E.D.Va.1977) (alternative holding sustained the City of Richmond's use of firefighter tests under § 1607.9 where tests had been proven job-related in a California validity study), *aff'd.* 588 F.2d 61 (4th Cir. 1978); *Buckner v. Goodyear Tire and Rubber Co.,* 339 F.Supp. 1108, 1115 (N.D.Ala.1972), *aff'd.* (and district court opinion adopted), 476 F.2d 1287 (5th Cir. 1973) (provisional use of tests permitted where validation studies at another Goodyear plant were available). § 1607.9's incorporation of the requirements of § 1607.7 is especially reasonable in light of the fact that § 1607.9 permits use of a test, possibly under the cloak of immunity as discussed below, which has a discriminatory impact.

**29.** After the dates fixed by the district court for the commencement of Title VII liability, two new sets of guidelines on employee selection procedure were issued: the Department of Justice Guidelines (effective November 17, 1976) and the Uniform Guidelines (effective Septem-

ber 25, 1978). *See supra,* n.11. Both the DOJ Guidelines and the Uniform Guidelines contain provisions on interim use which expressly deny an employer immunity in the event his pending validation study does not ultimately establish validity. *See* DOJ Guidelines § 5(h), 28 C.F.R. Part 50.14 ("If the additional studies do not produce the data required to demonstrate validity, the user is not relieved of or protected against any obligations arising under federal law."); Uniform Guidelines, *supra,* n.11, § 5J, 43 Fed.Reg. at 38298 ("If the study does not demonstrate validity, this provision of these guidelines for interim use shall not constitute a defense in any action, nor shall it relieve the user of any obligations arising under Federal law."). Had the DOJ or Uniform Guidelines been in effect during the pendency of the Personnel Board's validation studies, a different issue would be presented. However, at all times relevant to the instant proceedings, only the EEOC Guidelines, as they were in effect before the adoption of the Uniform Guidelines, were in force. The EEOC Guidelines do not contain a disclaimer of immunity similar to that contained in the DOJ and Uniform Guidelines.

**30.** *Friend v. Leidinger,* 446 F.Supp. 361, 370 (E.D.Va.1977), *aff'd.* 588 F.2d 61 (4th Cir. 1978) (Title VII, § 713(b) extends immunity during § 1607.9 interim use).

person shall be subject to any liability or punishment for or on account of (1) the commission by such person of an unlawful employment practice if he pleads and proves that the act or omission complained of was in good faith, in conformity with, and in reliance on any written interpretation or opinion of the [EEOC].[31]

If, however, the district court, upon remand, finds that the conditions for § 1607.9 provisional use were not satisfied or that the Board did not in good faith rely upon that section while awaiting the final results of the validation studies, then the court must mark March 24, 1972, as the date of violation of Title VII, with respect to both tests. A new remedy must then be fashioned by the court to correct the discrimination caused by use of the tests from that date forward.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

---

**31.** By holding that the Board would not be subject to liability during the period it satisfied and relied upon § 1607.9, we are not, as plaintiffs contend, assuming that a grace period should be implied for public employers similar to the one-year grace period expressly accorded private employers (Title VII, § 716(a)), when Title VII was first enacted. *See Blake v. City of Los Angeles, supra,* 595 F.2d at 1376–77 (refusing to imply grace period for public employers). Rather, our holding is based on the immunity which Title VII, § 713(b) extends to an employer who complies with, and relies in good faith upon, the EEOC Guidelines.